UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PATRICIA WALLIS, As Administratrix<br>Of the ESTATE OF JEFFREY HEALEY,<br>And next best friend.<br>    *Plaintiff*<br><br>v<br><br>CITY OF WORCESTER, OFFICERS, MICHAEL<br>LAHAIR, THOMAS BARNEY, KEVIN<br>JOHANSON, STEVEN HAIR, ANNA DIAZ,<br>FRANCIS BARTLEY AND THOMAS BARNEY<br>IN THEIR CAPACITY AS POLICE OFFICERS OF<br>THE CITY OF WORCESTER AND IN THEIR<br>INDIVIDUAL CAPACITY<br>    *Defendants* | CIVIL ACTION<br>DOCKET NO.: 03-11318 FDS |

### PLAINTIFF, PATRICIA WALLIS, AS ADMINISTRATRIX OF THE ESTATE OF T. JEFFREY HEALEY, AND NEXT BEST FRIEND'S SUPPLEMENT TO HER OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now comes the Plaintiff, Patricia Wallis, as Administratrix of the Estate of T. Jeffrey Healey, and next best friend ("Plaintiff") and hereby submits this Supplement to her Opposition to Defendants, City of Worcester, Officers Michael LaHair, Thomas Barney, Kevin Johanson, Steven Hair, Anna Diaz, Francis Bartley, and Thomas Barney ("Defendants" or "Individual Defendants") Motion for Summary Judgment.

As the plaintiff asserted in her Opposition to Defendant's Motion for Summary Judgment, the Defendants are not entitled to judgment as a matter of law because Defendants have not met their burden and the Plaintiff has established genuine issues of material fact, to wit: the Defendants reasonably should have known of T. Jeffrey Healey's ("decedent") suicidal tendencies for the reasons set forth herein as well as those

1

raised in the Plaintiff's Opposition to Summary Judgment. *See* Elliot v Cheshire County, 940 F. 2d 7 (1st Cir. 1991).

I. **INTRODUCTION.**

On June 5, 2006 this Court heard oral arguments on Defendants' Motion for Summary Judgment. Plaintiff raised numerous issues pertaining to the Worcester Police Department incident / investigative report ("Report") of the decedent's suicide at the Worcester Police Department cell room while he was in the custody, care and control of the Worcester Police Department. Specifically Plaintiff pointed out to the Court that whole sentences were redacted and that numerous pages and paragraphs were deleted and/or missing. The Defendants were ordered by this Court, to file with the Court and provide Plaintiff with the complete and unredacted Report. Defendants provided Plaintiff with the complete and unredacted fifteen (15) page Report[1], which is the subject of this Supplement.

A thorough review of the Report reveals probative evidence of facts, circumstances and inferences that can be drawn therefrom as to the decedent's suicidal tendencies. Furthermore the complete and unredacted Report sets forth circumstances which are in direct conflict with statements in the individual Defendants affidavits. The Report also establishes that the decedent was intentionally denied his right to a telephone call under MGL c. 276 § 33A.

---

[1] The Report provided to Plaintiff and filed with this Court on June 12, 2006 is suspect. The incomplete and redacted report Plaintiff attached as Exhibit "C" to her Opposition Is dated Monday, September 10, 2001. The Report Defendants provided to Plaintiff by Court Order, however, is dated Wednesday, May 29, 2002. There has been no explanation as to why the dates are different by the Defendants or their counsel. Plaintiff hereby reserves all rights to object to the Report and requests this Court further order the original report dated September 10, 2001 be provided to Plaintiff.

2

The plaintiff has clearly produced enough evidence of genuine issues of material fact that the Worcester Police Department and its officers violated the civil rights of the decedent and wrongfully caused his death.

## II. ARGUMENT

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Beatty v. WMATA*, 860 F.2d 1117, 1120-21 (D.C. Cir. 1988). Summary Judgment is especially disfavored where knowledge or state of mind is at issue. Quincy Mutual Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984).

As Elliot v Cheshire County, 940 F. 2d 7 (1st Cir. 1991) stated, to prevail in a custodial suicide case under a 42 U.S.C. § 1983, the plaintiff must show whether the defendants knew or, ***reasonably should have known***, of the detainees suicidal tendencies. (emphasis supplied). A violation of a detainees constitutional right can occur "when prison officials intentionally place prisoners in dangerous surroundings, when they intentionally ignore prisoners' serious medical needs, or when they are 'deliberately indifferent' either to prisoners' health or safety." Id.

Plaintiff asserts that T. Jeffrey Healey's serious medical needs were intentionally ignored by the individual Defendants and that the individual Defendants acted with deliberate indifference to T. Jeffrey Healey's health and safety.

3

A. **THOUGH UNMENTIONED IN THE REDACTED POLICE REPORT, THE INDIVIDUAL DEFENDANTS VIOLATED MGL C. 276 § 33A WHEN THEY DENIED THE DECEDENT HIS RIGHT TO THE USE OF A TELEPHONE AND ULTIMATELY CAUSED THE DECEDENT TO COMMIT SUICIDE.**

There is a genuine issue of material fact that the denial of this basic right to a phone call is ultimately what caused the decedent to take his life. Pursuant to MGL c. 276, § 33A:

> *The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter.*

A crucial paragraph excluded from the redacted report was paragraph #5. In this paragraph Officer Bartley explains that the decedent left the note "No Call Was Allowed" **in blood** on the wall of his cell. (Unredacted Report p.11) (emphasis supplied). Both the unredacted statements of Officer Diaz p.2 and Officer Barney p.4 acknowledge that the decedent banged on Plexiglas while repeatedly requesting a phone call, yet neither of their affidavits mention this request or why it was denied.

It is uncontested that the decedent was in the custody of the Worcester Police Department and the individual defendants from roughly 3 am to 6 am. Also it is admitted by the defendants that the decedent had, on his person, $7.87 (Inventory Report p.13). The request for a phone call was continuously made vociferously, numerous times and heard by more than one of the officers. See e.g., Statement of Anna Diaz p.2 and Statement of Thomas Barney p.4. Given that the decedent was at the police station for over one hour and had sufficient money to make his rightful phone call, there is no reason

4

his requests should have been denied. There is no mention in the unredacted report of the decedent being even advised of his right at any time, let alone "forthwith upon his arrival" at the station. Clearly this repeated deprivation of the decedent's right to a call is what ultimately caused him to take his life, as evidenced by his suicide note "No Call Was Allowed" written in blood on the wall of his cell (Report of Francis Barney p. 11). The individual defendants must answer as to why this simple, mandatory, probably life preserving, request was not granted. It is reasonable to believe that the officers recklessly, willfully and maliciously kept denying the decedent his right in order to taunt and antagonize him further. It is clear the officers knew this type of behavior was a violation of the decedents civil rights given that they intended to conceal the entire event by means of omitting it from the redacted police report. This type of deliberate disregard for the life and safety of the decedent and abuse of authority, especially when exhibited by officers of the law, is a clear violation of a person's civil right and cannot be tolerated in a civilized society.

    B.    BY FAILING TO CONDUCT ANY CHECK OF THE DECEDENT FOLLOWING HIS PLACEMENT IN CELL 3, THE WORCESTER POLICE DEPARTMENT AND THE INDIVIDUAL DEFENDANTS EVIDENCED DELIBERATE INDIFFERENCE TO THE HEALTH AND SAFETY OF THE DECEDENT.

The individual defendants' decision to keep the decedent in an unchecked cell, shows a clear and total disregard to a prisoner's safety. There was a complete lack of observation of the decedent between the hour of 5 am and 6 am. The individual defendants did not conduct periodic checks. See; Statement of Anna Diaz p.2; Statement of Thomas Barney p. 4 (Officer Barney stated that he didn't see the decedent after placement in Cell 3 until the 6:00 am check); Statement of Kevin Johansen p.6-7 and Report of Francis Bartley p.10-13, generally. This was so despite the attested to fact that

5

the decedent was yelling and banging in his cell throughout his detention [Further, despite their non-observance of the decedent, two of the officers state that they did not believe him to be suicidal. See e.g. Statement of Officer Kevin Johansen p.6 and Statement of Officer David Mita p.8.] The decision not to observe the decedent should be deemed a conscious and deliberate disregard for his safety. Thus, there exists a genuine issue of material fact that had any of the individual defendants made an effort to observe the decedent during his period of detention they would have been able to make a proper determination that he was indeed a danger to himself and should have been monitored throughout.

    C.    THE WORCESTER POLICE DEPARTMENT AND THE INDIVIDUAL DEFENDANTS EVIDENCED A TOTAL DISREGARD FOR THE SAFETY AND PHYSICAL WELL BEING OF THE DECEDENT AND OTHER PRISONERS IN THEIR CARE, CUSTODY AND CONTROL AND CLEARLY DENIED THE DECEDENT HIS CIVIL RIGHTS.

On the morning of September 5, 2001 all of the other monitored cells in the Worcester Police Department were already occupied (Report of Francis Bartley p.11). The lack of availability resulted in inmate Christopher Colon, who was considered a danger to himself, to be placed in the cell across from the decedent. (Id.) Like the decedent, he went unmonitored between 5 am and 6 am. Additionally, there is a genuine issue of material fact that given Colon was considered a threat to himself and that the decedent was overtly upset and disruptive, it was reckless that the individual defendants did not make periodic trips to check on these two prisoners. If the defendants had conducted a check between 5 am and 6 am on even Christopher Colon, who was a suicide threat, they would have also been able to check on the decedent whose cell was across from Christopher Colon's cell. (Id.) The treatment of Christopher Colon clearly supports

the plaintiff's position that the Worcester Police Department and the individual defendants had a total and conscious disregard for not only the decedent, but for other prisoners in their care, custody and control.

    D.    THE FACT THAT THE DECEDENT DID NOT EXPLICITLY STATE HE WAS SUICIDAL IS NOT DISPOSITIVE IN DETERMINING WHETHER THE DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT THE DECEDENT WAS A SUICIDE RISK.

There are genuine statistical issues of fact as to whether the defendants knew or should have known that the decedent was a suicide risk. According to individual defendant's affidavits the determination that the decedent was not a suicide risk is based heavily on the fact that they observed no verbal threats of suicide, but the failure to give advance notice is not dispositive. Farmer v. Brennan, 511 U.S. 825, 848. The plaintiff may establish defendant's awareness by reliance on any relevant evidence. Id. As stated in the Plaintiff's Opposition to the Defendant's Motion for Summary Judgment, the decedent fit the profile of a suicide risk based on a study conducted by the Special Commission to Investigate Suicide in Municipal Detention Centers. There is a genuine issue of material fact that this evidence, when compared with the lack of observation and deliberate actions against the decedent, establishes that defendants showed reckless indifference towards the safety of the decedent. See e.g. Farmer (Appellate Court's decision for summary judgment reversed in prison rape case, despite the fact the victim did not give advance notice of a fear of harm, due to respondents' admission that victim, because his "youth and feminine appearance" was characteristic of someone likely to experience a great deal of "sexual pressure" in prison).

7

E. THE UNREDACTED POLICE REPORT REVEALS GENUINE ISSUES OF MATERIAL FACT THAT CONFLICTING INFERENCES CAN BE DRAWN FROM THE AFFIDAVITS OF THE INDIVIDUAL DEFENDANTS.

The Defendant's Motion for Summary Judgment should be denied because the unredacted report contradicts assertions in the affidavits of the individual defendants that the decedent did not display any suicidal tendencies. That the defendant knew or should have known that the decedent was a suicide risk can be established by alleging any facts that contest the affiants' assertions of facts; or by evidencing that conflicting inferences could be drawn from the defendants' affidavits. Slaven v. City of Salem, 386 Mass. 885, 888 (1982). Upon review of the unredacted report it is clear that many inconsistencies exist in the affidavits of the defendants to the point where it can be said vital facts were intentionally withheld.

The unredacted report substantially differs from the redacted report originally provided by the defendants. The redacted report contains only excerpts of Officer Francis Bartley's Investigative Report (portions of which are also blacked out) and fails to include any of the official statements provided by the individual defendants. Among these omissions were observations of the decedent by the individual officers and prisoner Christopher Colon which evidence that the defendants should have reasonably known the decedent was a suicide risk. The intentional withholding of this information, provides a genuine issue of fact that the officers were indeed aware that the decedent was a suicide risk.

Essential paragraphs were excluded from Officer Bartley's redacted report. For example, the omitted Paragraph # 4 outlines that the decedent was periodically banging and yelling between 5 and 6 am. (Unredacted Report p.11). Also, excluded Paragraph

8

#6 details how Dr. Benanti, of Medical City, was familiar with the decedent for prior visits for heroin abuse and psychiatric reasons. (Id.) Although this information is imperative in establishing that the defendants should have been aware that the decedent was a suicide risk, it is not present in the redacted report or in the affidavits of any of the individual defendants. That they were not compelled to testify to their true observations of the decedent in their affidavits, proves that the defendants knew that their actions on September 5, 2001 were in violation of the decedent's Civil Rights.

Further, statement # 4 in affidavit of Officer Barney is completely contradictory to Officer Barney's unredacted statement. In his affidavit Officer Barney swears to making periodic checks on the decedent after his return from the hospital until 6 am. In his statement Officer Barney admits that after the decedent returned from the hospital he left the decedent unmonitored until 6 am. This evidence diminishes Officer Barney's credibility.

According to the affidavits of all the individual defendants, the decedent did not display any behavior or statements that led any of the individual defendants to believe that he was suicidal. See e.g. Affidavit of Officer Thomas Barney, Affidavit of Officer Kevin Johansen, Affidavit of Officer Steven Hair, Affidavit of Officer Michael Lahair, Affidavit of Officer Ana Diaz. In the statements of the unredacted report, however, the individual defendants all observe the decedent yelling and having physical outbursts between the hour of 5 am and 6 am. Four of the individual defendants observed that the decedent was visibly upset before and while in his cell between the hours of 5:00 am and 6:00 am; See e.g., Statement of Anna Diaz p.2 (". . . he was banging on the Plexiglas."); Statement of Thomas Barney p.4 ("He was yelling and banging stating he wanted a

9

phone call."); Statement of Officer Kevin Johansen p.7 ("He was banging and making noise."); Statement of Officer David Mita p.8 ("he was upset [during the booking procedure] that he didn't have his wallet."); Report of Francis Bartley p.10 (The decedent was yelling and banging periodically between 5 am and 6 am). If these factors truly weren't concerns of the individual defendants that the decedent should be left unmonitored then there was no need to exclude them from the redacted report and further withhold the information in the individual affidavits.

Further, the Court has ruled, "state of mind is a difficult thing to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind." Hahn v. Sargent, 523 F. 2d 461 (1st Cir. 1975). In suicide cases decisions are tantamount to the thoughts and perceptions of all the individual officers involved as well as the decedent. The affidavits of Officers Barney, Lahair, Hair, and Diaz are remarkably vague. None of the officers gives a detailed description of the events that occurred between 5 and 6 am, the final hour of the decedent's life and arguably most critical hour of the case. Each of the individual officers swears that did not observe anything that would lead them to believe the decedent was suicidal, but none of the officers give us any further insight into their thought processes. "Great circumspection" into an individual's state of mind cannot be undertaken if no information about that individual's state of mind is provided. In a case with this much brevity, extreme vagueness in an affidavit is simply unacceptable.

There are other questions not revealed in the individual officer's affidavits that beg to be answered. For example, Officer Barney claims to have visited the decedent at 6:00 am allegedly to "quiet him down". (Incident Report of Francis Bartley p.10) Was

10

this what Officer Barney was actually doing, when the way to calm the decedent was to provide him with a phone call? The answer is obvious.

There is no mention of the decedent's suicide note on the wall when Officer Barney visited the decedent at 6 am. It was only after the visit that the note was apparently written. What did Officer Barney do or say? When he visited the decedent at 6:00 am he certainly denied him a phone call. Did he assault the decedent causing the necessary blood to write the note?

It required a significant amount of blood to write "No Call Was Allowed." The report does not mention anything about serious cutting or bleeding. The autopsy report said only abrasions. See e.g., Officer Gingerelli's Autopsy Report p.14 (An initial examination revealed a small abrasion under the victim's chin, several small abrasions on the right knee and a small abrasion in the middle of his lower back); Statement of Officer Kevin Johanson p.6 (Stated there was a small laceration on the decedent's chin with some dried blood on it and a tiny drip of blood coming from it); Statement of Officer David Mita p.8 (Stated that the decedent's white shirt had blood on it and he had cuts under the chin.). Where, therefore, did the blood come from?

These are all matters of fact for the jury to decide