## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| PATRICIA WALLIS, as Administratrix ) | |
| of the Estate of T. Jeffrey Healey and ) | |
| Next Best Friend, ) | |
| ) | **Civil No.** |
| Plaintiff, ) | **03-11318-FDS** |
| ) | |
| v. ) | |
| ) | |
| CITY OF WORCESTER, MICHAEL ) | |
| LAHAIR, THOMAS BARNEY, KEVIN ) | |
| JOHANSON, STEVEN HAIR, ANA DIAZ, ) | |
| and FRANCIS BARTLEY, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM AND ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a civil rights action against the City of Worcester and six of its police officers,

brought on behalf of the estate of a man who committed suicide while in police custody.  Plaintiff

Patricia Wallis, as administratrix of the estate and "next best friend" of her son, T. Jeffrey Healey,

alleges that the police officers knew that her son was suicidal and failed to intervene or prevent

him from committing suicide while in a jail cell at the police department.  The complaint asserts a

claim under 42 U.S.C. § 1983 for violation of Healey's constitutional rights and a claim for

wrongful death under Mass. Gen. Laws ch. 229, § 2.

On May 1, 2006, defendants the City of Worcester, Michael LaHair, Thomas Barney,

Kevin Johanson, Steven Hair, Ana Diaz, and Francis Bartley moved for summary judgment.  For

the reasons set forth below, defendants' motion for summary judgment will be granted.

I.    **Background**

A.    **The Arrest, Detention, and Suicide**

On September 5, 2001, at 2:23 a.m., Jeffrey Healey was arrested by Officers Gregory Joinville and Glenn Stout of the Worcester Police Department ("WPD").  He was arrested on charges of breaking and entering of a motor vehicle in the night time with the intent to commit a felony therein; disturbing the peace; resisting arrest; and larceny under $250.00.  Following his arrest, he was transported to the WPD for booking.  Healey was a Worcester resident and was apparently well-known to the WPD, having been arrested by Worcester police officers in the past.

Healey was injured in the course of the arrest.  His injuries were sufficiently severe that Officer Thomas Barney of the WPD transported him to the emergency room at UMass Memorial Hospital in Worcester, where he was examined by Dr. Rene Hipona.  Although Healey had sustained a laceration of the chin, he refused medical treatment.

Officer Barney transported Healey back to the WPD and placed him in cell number 3.  The cell was not monitored by video.  Healey was wearing sweatpants; the police did not remove the drawstring.

The Criminal Justice Information System ("CJIS") is a statewide computer system that tracks, among other things, information as to whether an individual has any outstanding warrants or poses a suicide risk while in custody.  A CJIS officer at the WPD is charged with conducting a search of the system as to each new prisoner who is booked on that officer's shift.  On September 5, Officer Michael Motyka, the CJIS officer on duty, conducted such a search with regard to

Healey.  The CJIS inquiry as to Healey's suicide status came back negative—that is, he was not deemed to be a suicide risk while in custody.

According to plaintiff, an individual being held in the cell next to Healey's stated that he heard Healey "complaining about his bone coming through his chin and that he wanted medical assistance."  The same individual reported that Healey was hysterically screaming and crying and banging on the cell.  Healey asked to be allowed to make a phone call, but was not permitted to do so.

There is some dispute as to how frequently Officer Barney checked on Healey in his cell.  It appears, however, that the last check prior to his death occurred at approximately 6:00 a.m.  Immediately after the 6:00 cell check, Officer Barney left the WPD to pick up the prisoners' breakfasts.

Officer Barney returned approximately fifteen to twenty minutes later.  He stored his gun and immediately began delivering the breakfasts.

Officer Barney reached Healey's cell at about 6:24 a.m.  There, he saw Healey sitting on the toilet with something around his neck.  Officer Barney alerted his fellow officers and unlocked the cell.  Healey had apparently used the drawstring of his sweatpants to hang himself.  He had also written "No Call Was Allowed" in blood on the wall of his cell.  The officers detached the string and placed Healey on the floor.  Two officers performed CPR on Healey while Officer Barney went to call a dispatcher to request an ambulance and notified the WPD Service Division sergeant.

While the officers performed CPR on Healey, they detected a faint pulse. The officers performed CPR until the paramedics arrived and took over a short time later.  Healey was

transported to the hospital via ambulance, where he was pronounced dead.

A toxicology test was performed as part of the autopsy on Healey subsequent to his suicide. The toxicology report indicated that Healey's blood contained cocaine, cocaine metabolites, and methadone.

### B.     Prior Indications of Possible Suicide

According to plaintiff, in the summer of 2001, Patricia Wallis, Healey's mother, contacted the WPD in an attempt to obtain help locating her son, who was missing. Wallis informed members of the WPD that Healey suffered from depression and drug addiction, that he was suicidal, and that she needed help locating him because she was worried that he would commit suicide. Wallis also told them that her son frequently stated that he wanted to kill himself.[1] Wallis was told that officers were searching the Worcester area for Healey. A few days later, Wallis received a phone call from the WPD stating that Healey had been seen and was therefore no longer a missing person.[2]

---

[1] Healey had been treated on January 2001 at UMass Memorial Hospital. The medical records from the hospital indicate that Healey had suicidal ideation and that he suffered from major depression and major anxiety attacks.

[2] Plaintiff also submitted evidence of statements made by Steven Newton (a friend of Healey) to the WPD to the effect that Newton told unidentified Worcester police officers in June 2001 that Healey was suicidal. Plaintiff was unable to provide an affidavit from Newton, as he died in May 2003; instead, plaintiff's counsel, Joseph M. Mahaney, has submitted an affidavit setting forth statements made to him by Newton during a December 2001 interview.

Because the statements from Newton to the WPD are not offered for the truth of the matter asserted, but rather to show that the WPD had notice of Healey's suicidal tendencies, they are not hearsay. *See* Fed. R. Evid. 801(c). Newton's statements to Mahaney, however, are hearsay, not within any exception. Accordingly, they are inadmissible and will not be considered for purposes of the present motion for summary judgment.

## II.   Analysis

### A.   Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A genuine issue is one "that a reasonable jury could resolve . . . in favor of the nonmoving party." *United States v. One Parcel of Real Property*, 960 F.2d 200, 204 (1st Cir. 1992). A fact is material "when [it] has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant." *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995)). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

### B.   Section 1983 Claim against LaHair, Barney, Johanson, Hair, Diaz, and Bartley

Count One of the complaint is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. It alleges that defendants LaHair, Barney,

Johanson, Hair, Diaz, and Bartley violated Healey's civil rights in that they were "reckless and callously indifferent" to his "right to be secure in his life and person and to proper medical care while confined pursuant to state authority."

To establish liability under 42 U.S.C. § 1983, plaintiff must prove that defendants (1) were acting under color of state law and (2) violated a right protected by the Constitution or laws of the United States. *Cruz-Erazo v. Rivera-Montanez*, 212 F.3d 617, 621 (1st Cir. 2000). Defendants concede that they were acting under color of state law at all times relevant to this case. The parties dispute, however, whether defendants violated a right protected by the Constitution or laws of the United States.[3]

The due process clause prohibits "deliberate indifference" by police and prison guards to the serious medical needs of pre-trial detainees. *See Elliott v. Cheshire County, N.H.*, 940 F.2d 7, 10 (1st Cir. 1991). Among other things, "police officers violate the fourteenth amendment due process rights of a detainee if they display a deliberate indifference to the unusually strong risk that a detainee will commit suicide." *Bowen v. City of Manchester*, 966 F.2d 13, 16 (1st Cir. 1992) (internal citation omitted).

> The "deliberate indifference" standard means more than simple negligence. . . . [A] plaintiff may establish deliberate indifference in a prison suicide case by showing

---

[3] Plaintiff also attempts to base § 1983 liability on defendants' alleged violations of state law. Specifically, plaintiff alleges that defendants (1) did not physically or visibly check Healey's cell with appropriate frequency in violation of Mass. Gen. Laws ch. 40, § 36B, and (2) failed to permit Healey to use the telephone in violation of Mass. Gen. Laws ch. 276, § 33A.

It is well-established, however, that "a violation of state law . . . is not inherently sufficient to support a § 1983 claim." *Boveri v. Town of Saugus*, 113 F.3d 4, 7 (1st Cir. 1997); *see also Boston Envtl. Sanitation Inspectors Assoc. v. City of Boston*, 794 F.2d 12, 13 (1st Cir. 1986) (holding that claims that defendants breached state statutory provisions and applicable labor contracts could not form the basis of a civil rights action). In fact, "[e]ven bad-faith violations of state law are not necessarily tantamount to unconstitutional deprivations of due process." *Amsden v. Moran*, 904 F.2d 748, 757 (1st Cir. 1990).

> (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

*Id.* at 17 (internal citation omitted). Moreover, "[a] finding of deliberate indifference requires a strong likelihood, rather than a mere possibility, that self-infliction of harm will occur." *Torraco v. Maloney*, 923 F.2d 231, 236 (1st Cir. 1991).[4]

Plaintiff contends that the key issue is whether defendants knew, *or reasonably should have known*, of Healey's suicidal tendencies, citing the First Circuit's opinion in *Elliott*, 940 F.2d at 10-11. However, the "deliberate indifference" standard set forth in *Elliott* was subsequently modified by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994). *See Clinton v. County of York*, 893 F. Supp. 581, 584-85 (D.S.C. 1995) (recognizing modification of *Elliott* by *Farmer*). In *Farmer*, the Supreme Court established a subjective standard for liability:

> [A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as [a constitutional violation].

511 U.S. at 837-38. Thus, to be found liable, defendants must have actually known (or have been willfully blind to the fact) that Healey posed a serious risk of suicide; it is not enough for plaintiff to prove that they reasonably should have known of that risk.

---

[4] *Torraco* involved a convicted prisoner, rather than a pre-trial detainee, and the issue thus arose under the Eighth Amendment right to be free from cruel and unusual punishment rather than the Fourteenth Amendment right to due process of law. *See id.*, 923 F.2d at 234. There is no apparent distinction between the two constitutional standards as to the "deliberate indifference" standard.

Each of the named defendants have submitted sworn affidavits stating that he or she had no indication, either from Healey's behavior or his statements, that Healey was a suicide risk. In addition, the affidavit of Officer Motyka states that he checked the statewide CJIS system and that Healey was not identified in that database as a suicide risk.

Plaintiff argues at some length that the police officers should have known that Healey was suicidal, but offers very little, if any, evidence that they had any actual knowledge of that fact. Instead, plaintiff attempts to establish a dispute of material fact as to defendants' knowledge by pointing to alleged inconsistencies in the police investigation report that was prepared following Healey's death.

First, plaintiff notes that the unredacted version of the police investigation report substantially differs from the redacted version that was initially provided by defendants. Plaintiff contends that the intentional withholding of information in the original, redacted version creates a genuine issue of fact as to whether defendants were indeed aware that Healey posed a suicide risk. Second, plaintiff contends that Officer Barney's statement in the unredacted police report contradicts the affidavit he submitted in support of the motion for summary judgment. In the unredacted report, Officer Barney is asked when he next had contact with Healey after placing him in his cell. In reply, Officer Barney states: "I was doing the six o'clock check and I started talking to Healey." According to plaintiff, this statement establishes that Healey's cell was left unmonitored until 6:00 a.m., which contradicts Officer Barney's affidavit, in which he states that he made periodic checks on Healey.

Both points are without merit. First, the fact that the unredacted police report includes information omitted from the redacted version proves nothing; the entire purpose of redacting a

8

document is to omit information, and there are multiple legitimate reasons why a police

department might choose to do so.  It is not reasonable to infer from the department's decision to

redact the original copy of the report that the defendant officers had actual knowledge of Healey's

suicidal tendencies.  Second, even taken in the light most favorable to plaintiff, Barney's statement

in the unredacted report only creates an issue of fact as to whether he checked on Healey prior to

6:00 a.m.  It does not raise an issue of fact as to whether Barney, or any of the other officers who

had contact with Healey on September 5, actually knew that Healey was suicidal.

    Accordingly, there is no genuine issue of material fact as to whether defendants actually

knew (or were willfully blind to the fact) that there was an unusually serious risk of suicide or

other self-inflicted harm.  Defendants are therefore entitled to summary judgment on Count One

of the complaint.[5]

### C.    Wrongful Death Claim against City of Worcester

    Count Two of the complaint asserts a wrongful death claim against the City of Worcester

pursuant to Mass. Gen. Laws ch. 229, § 2.  That statute creates a cause of action against "[a]

person . . . who by his negligence causes the death of a person . . . ."  *Id.*  To prove that the City's

negligence caused Healey's death, plaintiff must first establish that the police officers who had

custody of Healey had a duty to take steps to prevent his suicide; that is, plaintiff must show that

the officers knew, or reasonably should have known, that Healey was suicidal.  *See Slaven v. City

of Salem*, 386 Mass. 885, 890 (1982) ("Until the city's duty is established, by the facts or

otherwise, whether the prisoner was wearing a belt at the time of his arrest is immaterial.").

---

[5] Because the Court concludes that defendants are entitled to summary judgment on the § 1983 claim, the
Court need not reach defendants' alternative argument that they are entitled to qualified immunity.

Summary judgment is generally disfavored where knowledge or state of mind is at issue. *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 86 (1984). Nonetheless, defendants contend that summary judgment should enter in their favor, because no rational view of the evidence warrants a finding that the officers knew or should have known that Healey was a suicide risk. The Court agrees that summary judgment is warranted here.

"In cases that have addressed the issue of the liability of a jailor for the suicide of one in his custody, most have required that there be evidence that the defendant knew, or had reason to know, of the plaintiff's suicidal tendency." *Slaven*, 386 Mass. at 888; *see also Richardson v. Dailey*, 424 Mass. 258, 260 (1997). As discussed above, plaintiff has presented no evidence that the police officers who had contact with Healey actually knew that he was suicidal. Plaintiff contends, however, that the officers should have known that he presented a high risk of suicide, based on three factors: (1) Healey's mother, Patricia Wallis, informed the WPD in the summer of 2001 that her son was suicidal; (2) Healey's behavior after his arrest indicated that he had a total disregard for his own physical and mental well-being; and (3) the officers should have been aware of the high probability of suicide based on the May 1984 final report of the Special Commission to Investigate Suicide in Municipal Detention Centers. Those factors, however, do not support a finding that the officers reasonably should have known that Healey was suicidal.

First, Wallis has stated that she contacted the WPD in the summer of 2001 to report that her son had gone missing. According to her affidavit, she informed the WPD that Healey suffered from drug dependency and that he was depressed and suicidal. There is no evidence, however, that Wallis spoke to any of the defendant officers or that any of those officers were otherwise informed or aware of Healey's drug use, depression, or suicidal ideation. In fact, Wallis's

10

affidavit provides no indication as to which officers she spoke with at WPD, except to state that she was transferred to the missing persons unit. Nor has plaintiff provided any authority suggesting that, under the circumstances, all of the officers of a police department should be deemed to have the knowledge of any individual officer. Accordingly, Wallis's statement is plainly insufficient to establish that the officers who ultimately arrested and had custody of Healey should have known that he was a suicide risk.

Second, Healey's behavior on the night of his arrest, while irrational, did not suggest that he was suicidal. There is no evidence suggesting that Healey made any statements suggesting that he intended to harm himself. Healey's refusal to accept medical treatment for the cut on his chin did, of course, indicate a certain level of disregard for his well-being, as did his disruptive behavior in his cell. Unfortunately, irrational or disruptive behavior is commonplace in a police station lockup, particularly for detainees who are under the influence of intoxicants. Such behavior, however, rarely concludes with suicide. The Court sees no reason why Healey's behavior, under the circumstances, would give the officers reason to know that he planned to kill himself in his cell.

Plaintiff also argues that Healey was not permitted to make a telephone call, in violation of state law, and that he was obviously distraught over that fact (he yelled repeatedly that he wanted to make a telephone call, and eventually wrote "No Call Was Allowed" in blood on the wall of his cell). Plaintiff contends that "[i]t is reasonable to believe that the officers recklessly, willfully, and maliciously kept denying [Healey] his right in order to taunt and antagonize him further." Even assuming, however, that the police did not permit him to make a telephone call in violation of state law—and even assuming that they did so deliberately, for a malicious purpose—it does not

11

follow that they therefore knew or should have known that he was suicidal.  Again, illegal or abusive behavior by the police rarely results in suicide.  There is no evidence that the police refused to permit him to make a phone call in order to make him suicidal, or that they should have expected that suicide would be a likely consequence of that refusal.

Finally, plaintiff's reliance on the final report of the Special Commission to Investigate Suicide in Municipal Detention Centers, issued in May 1984, is entirely misplaced.  In *White v. Town of Seekonk*, 23 Mass. App. Ct. 139, 141-42 (1986), the Massachusetts Appeals Court referred to that report, which was apparently based on a study of fifty-four suicides that occurred from 1973 to 1984.  *Id.* at 141.  According to the opinion, the Commission found the following: (a) 73.6% of the reported suicide victims had been intoxicated to some extent when brought into the police station; (b) 97.1% of the reported suicide victims had records of prior arrests; (c) 50.0% of the reported suicide victims were known to the police who detained them; (d) 66.7% of the reported suicide victims were natives of the community in which they were arrested; (e) 96.2% of the reported suicide victims hanged themselves; (f) 77.4% of the reported suicide victims hanged themselves with articles of clothing which had not been taken away from them; and (g) 83.7% of the reported suicides occurred within four hours of the victims' being placed in lockups.  *Id.* at 141-42.  Plaintiff contends that the officers should have known that Healey was suicidal because he exhibited traits which, according to the report, were common among prison suicide victims (such as intoxication and a prior record).

There are multiple problems with plaintiff's argument, beginning with substantial doubt as to the utility of the statistics.  The Commission's report was published seventeen years before Healey's arrest, and was based on suicide data going back as far as 1973.  Statistical data

12

concerning suicide victims in 1973, or even in 1984, is not necessarily valid in 2001, and plaintiff has offered no evidence of the data's continued validity.[6]  Furthermore, there is no evidence that the statistics cited are a reliable predictive tool as to particular individuals; surely every local person with a criminal record who is arrested while intoxicated need not be placed on a suicide watch.

In short, there is insufficient evidence that the police officers knew or reasonably should have known that Healey was suicidal, and therefore plaintiff cannot sustain her wrongful death claim against the City of Worcester.  *See Slaven*, 386 Mass. at 888-89.  Accordingly, summary judgment will be granted in favor of the City as to Count Two of the complaint.

*     *     *

The suicide of Jeffrey Healey was, without question, a tragedy.  It appears to have been the product of significant and long-standing mental health issues, compounded by serious drug abuse.  Nonetheless, it might well have been prevented by the right intervention at the right moment; perhaps it might also have been prevented by a different set of police responses after his arrest.  It does not follow, however, that the police violated his constitutional rights or negligently caused his death under state law.  Because plaintiff has failed to establish the necessary elements of either claim, summary judgment for defendants is appropriate.

## III.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

---

[6]  Moreover, plaintiff merely cites to the report's statistics—which she appears to have taken from the opinion in *White*—without submitting the actual report.  The Court therefore cannot evaluate the factual basis or methodology of the report.

13

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV

Dated: March 1, 2007    United States District Judge